683 A.2d 262

**PENNSYLVANIA HUMAN RELATIONS COMMISSION and the State Workmen's Insurance Fund,**

v.

**WORKMEN'S COMPENSATION APPEAL BOARD (Sidney V. BLECKER).**

**Appeal of Sidney V. BLECKER.**

Supreme Court of Pennsylvania.

Argued Jan. 25, 1996.

Decided Sept. 19, 1996.

84

Steven J. Schiffman, Harrisburg, for Appellant.

Richard Faux, Lansdale, for Appellees.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE and NIGRO, JJ.

## *OPINION*

ZAPPALA, Justice.

This is an appeal by Sidney V. Blecker from the order of the Commonwealth Court reversing the order of the Workmen's Compensation Appeal Board granting benefits for a psychic injury claimed to have been caused by his employment as an attorney with the Pennsylvania Human Relations Commission. The Commonwealth Court held that Blecker was not entitled to workers' compensation benefits because he had failed to establish that his psychic injury was caused by abnormal working conditions. For the following reasons, we affirm.

The scope of appellate review in workers' compensation proceedings is limited to a determination of whether constitutional rights have been violated, an error of law has been committed, or any findings of fact are supported by substantial evidence. *Volterano v. Workmen's Compensation Appeal Board,* 536 Pa. 335, 639 A.2d 453 (1994). Blecker asserts that the Commonwealth Court committed an error of law in failing to apply the proper standard in determining whether he was entitled to benefits.

To recover workers' compensation benefits for a psychic injury, a claimant must prove by objective evidence that he has suffered a psychic injury and that such injury is other than a subjective reaction to normal working conditions. *Martin v. Ketchum, Inc.*, 523 Pa. 509, 568 A.2d 159 (1990). Even if a claimant shows actual, not merely perceived or imagined, employment events that have precipitated psychic injury, he or she must still prove the events to be abnormal in order to recover. *Wilson v. Workmen's Compensation Appeal Board (Aluminum Company of America)*, 542 Pa. 614, 626, 669 A.2d 338, 344 (1996).

In 1974, Blecker was employed with the HRC as a compliance training officer. Although he was an attorney, the position itself did not require a law degree. He held that position until May 1978 when he became the assistant general counsel to the HRC. This gave him the opportunity to again perform legal services as he had done before his employment with HRC began. He was informed that his role would be that of the litigation attorney for the Harrisburg regional office because of his extensive experience in that regard.

On January 25, 1985, Blecker filed a claim petition seeking workers' compensation benefits alleging that he had suffered an adjustment reaction with anxiety after he was given a performance evaluation by his employer on November 8, 1984. Initially, he sought to recover benefits for the time period between November 8, 1984, and January 7, 1985 (the date he returned to work). The workers' compensation proceedings were protracted, however, and spanned over two years. Before the hearings were completed, Blecker's claim petition was amended to include an allegation of total disability due to his psychic injury following his final day of employment with the HRC on October 16, 1985.[1]

1. On October 15, 1985, Blecker and HRC executed a release pursuant to which Blecker agreed to apply for disability retirement and to voluntarily retire either on the date that his eligibility for disability retirement was determined or after his existing annual leave time had expired. Blecker agreed to release any claim or cause of action against the HRC, with the specific exception of his then-pending claim for workers' compensation benefits.

On December 13, 1988, the referee denied the claim petition.[2] The referee found that Blecker had suffered a subjective reaction to a poor evaluation of his work performance given by his supervisor and concluded that the evidence established that he did not suffer any injury as a result of abnormal work conditions. The Board affirmed the referee's decision.

On appeal, Blecker argued that the rendering of the performance evaluation was abnormal not only because his rating was unjustifiably low but also because new performance standards were retroactively applied to him. The performance evaluation covered the period from May 1983 to May 1984. In January 1984, the HRC implemented written performance standards for attorneys which were considered in evaluating Blecker's performance. Because the referee had not specifically addressed the issue of whether the application of the written performance standards to Blecker's evaluation was an abnormal working condition, the Commonwealth Court remanded the case for a determination of that issue.[3] *Blecker v. Workmen's Compensation Appeal Board,* 141 Pa.Cmwlth. 317, 595 A.2d 729 (1991) *(Blecker I).*

After the matter was remanded, the referee issued additional findings of fact addressing the written performance standards. He concluded that the application of those standards to Blecker's performance evaluation was an abnormal working condition. The referee awarded benefits to Blecker for the period beginning November 19, 1984, through January 7, 1985, and from October 17, 1985, onward. The Board affirmed the referee's decision on August 10, 1993.

2. This case was heard prior to the passage of Act 44 of 1993 in which the title of referee was redesignated as "worker's compensation judge." 77 P.S. § 701.

3. The court also remanded for a clarification of the referee's finding of fact 26(c) which stated that "the testimony of defendant's witnesses were [sic] credible and the witness for the claimant incredible and incompetent." Since Blecker had presented the testimony of more than one witness, it was unclear whether the referee found all of his witnesses, or any one of those witnesses, to be incredible.

HRC appealed from the Board's decision asserting, inter alia, that (1) the Board erred as a matter of law in affirming the referee's decision that the retroactive application of performance standards constituted abnormal working conditions; and (2) the referee erred in concluding that Blecker sustained his burden of proving that the alleged injury was caused by abnormal working conditions. The Commonwealth Court reversed the Board's decision, concluding that the referee had erred in determining that the application of the written performance standards to Blecker constituted an abnormal working condition. *Pennsylvania Human Relations Commission v. Workmen's Compensation Appeal Board,* 655 A.2d 1055 (Pa. Cmwlth.1994) (*Blecker II*).

We granted allocatur to address the issue of whether the retroactive application of the written performance standards to Blecker's evaluation constituted an abnormal working condition. We find that the evidence introduced in this case was insufficient to establish that the psychic injury was caused by an abnormal working condition.

"[P]sychic injury cases are highly fact-sensitive and for actual work conditions to be considered abnormal, they must be considered in the context of the specific employment." *Wilson,* 542 Pa. at 624, 669 A.2d at 343. (citation omitted). Appellate review of the referee's findings of fact is limited to a determination of whether the findings are supported by the evidence as a whole. Where no additional testimony is taken before the Board, the findings will be overturned only if arbitrary or capricious. Whether the findings of fact support a conclusion that the claimant has been exposed to abnormal working conditions is a question of law, however, that is fully reviewable on appeal. *Id.*

When Blecker became assistant general counsel to HRC in 1978, Regional Director Thelma Griffith Johnson prepared a memorandum dated May 26, 1978, addressing his responsibilities in the office. The memorandum stated, "It is my understanding that we have agreed, because of your extensive experience, that you will take on the role of litigating attorney,

although you will not handle all of the litigation out of this office exclusively." It was contemplated that the attorneys in the office would share the litigation workload, with administrative responsibilities handled by an attorney other than Blecker.

Thelma Johnson supervised Blecker from May 1978 to June 1982. During that period of time, Johnson repeatedly chastised Blecker for unsatisfactory work habits. Numerous memorandums were sent to Blecker addressing Johnson's concerns with his productivity and inefficient management of his work time. Johnson continually monitored Blecker's performance and expressed her dissatisfaction to him, although no written performance evaluations were prepared.

On August 19, 1982, Howard Tucker, Jr. succeeded Johnson as regional director of the Harrisburg office and assumed a direct supervisory role over Blecker and G. Thompson Bell, another attorney in that office. Tucker had previously supervised Blecker when he served as a compliance officer with HRC. Tucker had been critical of Blecker's work performance in that capacity and had prepared written memorandums explaining the deficiencies he had observed. Once Blecker became assistant general counsel, Tucker no longer had any supervisory authority over him until Johnson left the regional director position. Tucker experienced some difficulties with Blecker later, but chose to address them by speaking to Blecker.

Tucker supervised Blecker for administrative purposes, while G. Thompson Bell served as the supervising attorney responsible for overseeing the legal work performed in the office. Bell assumed the supervisory role in 1983, although Blecker had been an attorney and worked in that office longer than Bell. In January 1984, shortly after becoming the supervising attorney, Bell met with Blecker to discuss the problems he had observed in Blecker's past performance and the improvements that could be made. Bell also informed him that he would be responsible for completing Blecker's performance evaluation.

On January 20, 1984, HRC's newly appointed General Counsel Elisabeth Shuster implemented performance standards for attorneys which were to be used for evaluations. The standards provided an explanation of the eleven categories which made up the performance evaluation form, plus an additional category for litigation ability. In her introduction Shuster observed, "It may be that the evaluations done utilizing the criteria set forth below will be more stringent than previous evaluations done by previous supervisors. Therefore, a low performance level for any given performance factor may reflect the application of more rigorous standards, rather than a poorer job performance." The attorneys on staff were given copies of the standards.

Bell completed a performance evaluation form for Blecker which covered the period from May 1983 to May 1984. After discussing the evaluation with Tucker, Bell finalized the evaluation and arranged a meeting with Blecker. On November 8, 1984, Blecker met with Bell and Tucker and received a copy of the evaluation. Blecker received ratings of high to very good for safety; fair to good for analytical ability; low fair in the categories relating to quality of work, work habits, relationship with people and dependability; middle fair for commitment to affirmative action; and unsatisfactory for quantity of work, initiative, administrative ability, and litigation ability.[4]

The performance evaluation was not well received. Blecker, who prided himself on his personal commitment to affirmative action, was particularly disturbed by the middle fair rating in that category. Although Bell did not want to discuss the evaluation in detail until Blecker had an opportunity to read and consider the nine pages of comments accompanying the evaluation, several hours of discussion ensued. It was then agreed that they would meet again on November 19, 1984, to finish their discussion.

4. The categories included excellent, very good, good, fair, and unsatisfactory. With the exception of an unsatisfactory rating, the supervisor could rate the employee as high, middle, or low within any of those ratings.

Blecker did not appear on that date to review the evaluation. When his behavior at home caused his wife to become concerned, an appointment was scheduled with a psychiatrist, Dr. Lawrence Altaker. Dr. Altaker admitted him to a hospital for psychiatric treatment. Blecker remained in the hospital from November 27, 1984, to December 15, 1984. He was then treated on an outpatient basis with drugs and psychotherapy.

Dr. Altaker diagnosed Blecker as suffering from an obsessive personality disorder, which he described as a "lifelong personality type, and an adjustment disorder with anxiety."[5] It was his medical opinion that the obsessive personality disorder predated the November 8, 1984 evaluation, but that the performance evaluation resulted in Blecker's inability to function at work. Dr. Altaker observed that Blecker's obsessive personality disorder did not prevent him from functioning at work, although it would affect the way that he worked due to his tendency to dwell on detail and become bogged down as a result.

Dr. Altaker described the effect that the evaluation had on Blecker.

Q. Is the performance evaluation ... a very real event that affected Mr. Blecker?

A. I think so.

Q. Is there something particular with regards to Mr. Blecker with regards to affirmative action?

A. You mean, that particular part of the event?

Q. Yes.

A. Well, Mr. Blecker felt that all aspects of that report were invalid inasmuch as he felt he was doing his work very well, very thoroughly, that he was settling his cases, that even if he wasn't taking his cases to litigation which is what he felt they wanted him to do that he was doing well by his

5. Blecker also presented the deposition testimony of his treating psychologist, Dr. Stanley Schneider, who concurred in the diagnosis. HRC did not introduce any expert testimony and did not dispute that Blecker suffered from a psychic injury.

clients by settling them and getting them the kind of settlements that were in their best interests.

So he had no reason to feel that he was doing anything badly.

On top of it and I guess the crowning blow was the write-up on Human Relations in the sense of affirmative action in that he had always been active in civil rights causes and in all sorts of civil rights cases throughout the years.

And here someone was telling him that he is not being very responsive in terms of affirmative action.

That more than anything else hurt him.

R. 1009a–1010a.

Bell explained his reasons for the fair and unsatisfactory ratings given to Blecker in the evaluation. In regards to the category for commitment to affirmative action, Bell indicated that the rating was based upon the attorney's professional work rather than personal involvement in activities outside of his employment. Bell was aware that Blecker was actively involved in community work that demonstrated his personal commitment to affirmative action, but did not consider that as part of the evaluation. The criteria used by Bell focused only on work-related activities with an emphasis on aggressively moving cases through the system.

When the performance standards were adopted in January 1984, the attorneys were informed that they were expected to try a minimum of five public hearings per year. Bell testified that he had been told by the former general counsel to HRC that he was expected to do five public hearings each year prior to the effective date of the formal standards. He did not know whether Blecker or others had been apprised of this.

Bell indicated that he initially did not give Blecker any rating for litigation ability because he viewed that category as requiring him to evaluate Blecker's performance during hearings on the cases. Since Blecker had not taken any cases to hearing, Bell felt he could not give him a rating. When he reconsidered the matter after discussions with his superiors,

Bell gave Blecker an unsatisfactory rating due to his failure to move cases through the hearing process.

Blecker was advised on November 8 that the evaluation was not final. Although he was too distressed to discuss the matter at the meeting scheduled for November 19, Blecker eventually worked with his supervisor to change the evaluation to a counseling memorandum.

The referee made the following findings of fact after the Commonwealth Court remanded the matter for a determination as to whether the application of the performance standards adopted in January 1984 constituted an abnormal working condition: [6]

3. This Referee finds that the retroactive application of the performance standards issued in January 1984 and applied to claimant's performance evaluation for the period of May 1983 through April 1984 constituted an abnormal working condition.

4. In finding that the retroactive application of the performance standards are abnormal working conditions this Referee finds that claimant was the only attorney to receive a performance evaluation in the Human Relations Commission during this time frame (1983–1984). This Referee finds that the supervising attorney Thomas Bell and the Regional Director did not receive a performance evaluation.

5. I further find that not only did the employer retroactively apply performance standards did [sic] it also rated claimant for incidents which occurred outside of the rating period.

\* \* \*

8. I find that prior to February 1984 there were no performance standards for commitment to affirmative action

---

**6.** On remand, the referee incorporated the findings of fact set forth in his decision dated December 13, 1988, with the exception of paragraph 13, which has no relevance to this appeal. The referee also made additional findings on which he based the award of benefits to Blecker.

and that the rating of affirmative action based on litigation also constituted an abnormal working condition as applied to the complainant.

9. Prior to the performance standards being published in January 1984 there was no performance standard requiring an HRC attorney to litigate any specific number of cases in any one year. Because claimant did not litigate the number of cases required by the later-adopted performance standard, he was severely criticized. Claimant, not knowing this was a performance standard and not having the necessary case load, was subjected to an abnormal condition of employment.

The referee found all of the witnesses who testified to be credible. He concluded that Blecker suffered a reaction to a performance evaluation that was the product of standards which were applied retroactively and that the reaction was caused by an abnormal working condition.

The Commonwealth Court reversed, finding that Blecker's psychic injury was caused by his subjective reaction to normal working conditions. The court concluded that the referee erred in determining that the application of the new performance standards to Blecker constituted an abnormal working condition, stating

It is clear from the record in this case that employer's decision to use the performance standards effective January 1, 1984 was no more than an unreasonable decision. As the record shows, no matter what standards the employer applied in evaluating claimant's performance, claimant would have sustained the same subjective reaction to a poor evaluation.

*Blecker II*, 655 A.2d at 1059.

The court concluded that the evidence established that Blecker's obsessive personality disorder would have prompted the same reaction regardless of when he received the evaluation or what standards were imposed. "As opined by the

medical witnesses, the fact that [Blecker] believed that his evaluation would not be anything but favorable was rooted in his personality disorder. He was unable to forsee [sic] anything but an excellent evaluation no matter what the criteria." *Id.*

Blecker asserts that the Commonwealth Court erred in holding that HRC's retroactive application of litigation-based performance standards was not an abnormal working condition.[7] He argues that the evaluation covered a time period during which litigation had not been considered a key factor and he could not have adjusted his performance to satisfy those standards. Blecker also argues that HRC singled him out for the evaluation and acted with calculated malice because his reaction to the evaluation was foreseeable.

HRC responds that Blecker had been made aware of the multiple deficiencies in his job performance over the years and the application of the January 1984 standards did not represent a significant factor in Blecker's poor evaluation. HRC describes Blecker as "a litigator who did not litigate" despite the fact that litigation was a necessary function of HRC attorneys. No attempt was made to single out Blecker as the timing of the evaluations was based on employees' anniversary dates.

7. Blecker also argues that his job responsibilities were markedly increased in March 1983 and that this change constituted an abnormal working condition. The record indicates that on March 10, 1983, Howard Tucker circulated a memorandum addressing the organizational and operational plans for the legal division of the Harrisburg regional office. The memorandum summarized his discussion with the three attorneys who made up that office, Blecker, Bell, and Ellen Barry, about the distribution of the workload. The discussion was held because Barry had joined the office the week before and management of the office's public hearing docket needed to be readjusted in response.

We need not address Blecker's contention that this change was an abnormal working condition because no expert testimony was introduced to prove that the change in the distribution of the workload caused his psychic injury. The focal point of this case has always been the effect of the performance evaluation and application of the 1984 standards.

Essentially Blecker is asserting that he would not have received an unfavorable evaluation had it not been for the implementation of the January 1984 performance standards. This contention is unsupported by the record. To the contrary, the evidence established that Blecker's superiors had expressed continual dissatisfaction with his performance because of his inordinate attention to detail and resulting inability to dispose of cases assigned to him. Blecker's commitment to his work was unassailed but, unfortunately, his perfectionism prevented him from handling the volume of cases as expected.

██ An employer may establish standards, goals, or objectives expected of employees. When an employer has not previously done so, the implementation of performance standards, even if applied to employees who were hired earlier, is not an abnormal working condition per se. It is not unusual that a change in supervisory personnel will portend other changes for employees who are under their direction. The performance of an employee's job responsibilities is typically judged by the expectations of the employer, whether communicated in writing or verbally.

In this case, the transition of regional directors resulted in the implementation of the 1984 written performance standards for HRC attorneys. The written standards provided more definitive guidelines as to the employer's expectations. Blecker's supervisor referred to those standards in completing the evaluation form. An overview of the evaluation form, however, indicates that Blecker's performance was not judged simply by reference to the 1984 litigation standards.

Litigation ability was only one consideration in the overall performance review. The remaining factors required Blecker's supervisor to consider qualities and traits that were not defined by the number of cases handled by an HRC attorney. Indeed, the accompanying comments to Blecker's evaluation describe ineffective communication skills and inefficient use of time that impacted on his performance. Recommendations

were also made as to how Blecker might improve those weaknesses. Review of the evaluation in its entirety discloses that the evaluation was based on problems that his supervisors had observed throughout his employment history, rather than deficiencies measured only against the new performance standards.

While the record demonstrates HRC's laxity in completing performance evaluation reports, the lapse did not foreclose HRC from correcting that oversight. Blecker's claim that his employer singled him out for evaluation is unsupported by the evidence. The anniversary date of his employment was in the month of May. When no evaluation by his supervisor was forthcoming, he sent a memorandum dated October 22, 1984, requesting information on its status. The memorandum referred to the fact that Blecker had requested that an evaluation be done several times before. His supervisor simply responded to this request.

We conclude that the evidence was insufficient as a matter of law to establish that abnormal working conditions caused Blecker's psychic injury. His injury was a subjective reaction to normal working conditions. Accordingly, the order of the Commonwealth Court is affirmed.

NEWMAN, J., did not participate in the consideration or decision of this case.

NIX, Former C.J., did not participate in the decision of this case.