**Deborah MILLER, Petitioner,**

v.

**WORKERS' COMPENSATION APPEAL BOARD (NEW WILMINGTON FAMILY PRACTICE), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs April 17, 1998.

Decided Jan. 27, 1999.

Domenic A. Bellisario, Pittsburgh, for petitioner.

Roy F. Walters, Jr., Pittsburgh, for respondent.

Before DOYLE, J., SMITH, J., and NARICK, Senior Judge.

DOYLE, Judge.

Deborah Miller (Claimant) appeals from an order of the Workers' Compensation Appeal Board (Board), which reversed a decision of a Workers' Compensation Judge (WCJ) which had granted Claimant benefits for a psychiatric injury.

Claimant was employed by New Wilmington Family Practice, Inc. (Employer) as an office manager. Employer engages in a medical practice that is a wholly owned non-profit subsidiary of Shenango Valley Medical Center, Inc. (SVMC), a hospital located in Farrell, Pennsylvania.[1] Employer also em-

---

1. SVMC merged with another hospital in 1992, and, collectively, the two entities became the

ployed a physician, Dr. John Dawson, who was Claimant's supervisor. SVMC established the New Wilmington Family Practice Corporation in 1991, and both the Claimant and Dr. Dawson were hired at that time.

Claimant's duties involved, among other things, handling patients' insurance information, billing, making deposits to SVMC and completing records showing the method of payment for services rendered to patients. SVMC supervised Employer's practices for billing medical insurance companies, and the hospital approved Employer's pricing schedules. Claimant was the only employee responsible for billing insurance companies for services rendered by Employer.

Although Dr. Dawson generally did not involve himself in insurance or billing matters, he nevertheless frequently elected to disregard the official billing schedule and reduce or waive medical fees for certain patients. This caused various bookkeeping and insurance problems that upset Claimant. Dr. Dawson's repeated decisions to alter the price of medical services, in part, motivated Claimant to submit a letter of resignation on or about February 6, 1992. Employer, however, refused to accept the resignation, and Claimant continued to work for Employer. Shortly thereafter, Claimant went on an extended medical leave for a kidney condition unrelated to the instant litigation; she was scheduled to return from her leave on March 16, 1992. Before going on leave, Claimant spoke with a representative of SVMC about billing problems with Employer, and the representative agreed to help Claimant solve those problems after she returned from her medical leave.

However, several days before Claimant returned from her medical leave, Dr. Dawson discovered that a patient was charged less than the health insurer was billed. Dr. Dawson became concerned that insurance companies were being billed for services that were never rendered or visits that never occurred. Dr. Dawson contacted Thomas Burich and J. Larry Heinike, top level managers of SVMC who were involved in the formation and operation of Employer. Mr. Burich and Mr. Heinike began to investigate Claimant and to

question Claimant's co-workers. Dr. Dawson told one of Claimant's co-workers that Claimant was stealing money from the practice and that the office locks were going to be changed.

Dr. Dawson telephoned Claimant on March 13, 1992, and told her to stop in Mr. Heinike's office to pick-up papers when she returned to work on March 16th. Upon her return to work, Claimant was summoned into an office where Mr. Burich, Mr. Heinike, and Dr. Dawson were waiting. They told Claimant that she was suspended from her employment pending an audit of the medical practice and accused her of stealing funds from Employer. They showed her various records indicating that insurers were being billed more than the amount charged to the patient; Claimant was accused of keeping the excess payment from the insurer. Claimant was threatened with prosecution and jail, and they demanded that she confess to the theft. Claimant, however, emphatically denied any wrongdoing.

Thereafter, Claimant began to experience extreme emotional distress, depression, anxiety, and other mental problems. Her problems escalated to the point where Claimant began to have suicidal thoughts. Ultimately, Claimant was hospitalized in the psychiatric ward of Sharon General Hospital from March 25 through April 3, 1992. Claimant never returned to work, and Employer has maintained her suspension, even though Ernst and Young analyzed Employer's billing records and found no evidence that Claimant embezzled money from the practice.

On May 1, 1992, Claimant filed a claim petition alleging that she sustained a psychic injury in the course of her employment. The petition was assigned to the WCJ, who conducted hearings in this matter.

At the hearings, Claimant testified to her problems with Employer's billing practices, Employer's accusations of theft and her mental breakdown as summarized above.

Claimant presented the deposition of Susan Moore, Employer's receptionist, who testified that Dr. Dawson altered the patient

charges from the cost listed in the practice's standard fee schedule and that he was constantly telling her what to charge different patients. She testified that she was present when Dr. Dawson, during the time that Claimant was on leave, discovered that an insurer was billed for more than the patient was charged and that Dr. Dawson indicated that he did not know why that happened and did not like the way it looked. Ms. Moore also stated that Dr. Dawson told her that he believed that Claimant was stealing money from the practice.

In addition, Claimant presented the testimony of Dr. Dawson, who was called for cross-examination. Dr. Dawson confirmed that he did not always charge the customary fee for the service provided because he thought that the cost of those services was too high, and he stated that he had disagreements with Claimant over how much to charge patients. Further, Dr. Dawson explained that when he had discovered the discrepancies in Employer's billing records, he became frightened that he would be charged with insurance and Medicare fraud and that his professional reputation would be destroyed. Regarding the March 16th meeting where Claimant was suspended, Dr Dawson denied that Claimant was threatened with jail or coerced into confessing to theft. Dr. Dawson admitted that he, Mr. Burich, and Mr. Heinike suspected that Claimant could have embezzled funds from Employer, but denied that Claimant was accused of stealing money from the practice.

Further, Claimant offered the testimony of Janice Griffin O'Reilly, an attorney who Claimant consulted immediately after the March 16, 1992 meeting. Ms. Griffin explained that Claimant had contacted her and described how Dr. Dawson, Mr. Burich and Mr. Heinike had accused her of theft, ordered her to confess and threatened her with jail. Ms. Griffin, thereafter, called Dr. Dawson, who told her that Claimant's description of the March 16th meeting was an accurate account of those events. Dr. Dawson also told Ms. Griffin that he would like to give Claimant her job back, but that the situation was out of his control and out of his hands.

With regard to the medical aspects of Claimant's case, she offered the medical opinion of Dr. Jose W. Santiago, her treating psychiatrist. Dr. Santiago opined that Claimant suffers from major depression, single episode, with psychosis in the form of paranoia, which he connected to the March 16th meeting where Claimant was accused of embezzlement by Employer. He further opined that Claimant is not able to return to work. Although Dr. Santiago recognized that Claimant had a long history of a troubled personal life, he noted that Claimant's major problems did not occur until after the March 16th meeting.

On the other hand, Employer presented the testimony of Mr. Burich, who denied that Claimant had been accused of stealing and threatened with jail. But, Mr. Burich did acknowledge that Mr. Heinike told Claimant that "[w]e'll go easy on you if you admit that there is something going on...." He also acknowledged that the Ernst and Young investigation did not reveal that Claimant embezzled any money from Employer.

Employer presented the deposition of Mr. Heinike, who denied accusing Claimant of embezzlement or telling her that she was going to jail, and he stated that he handled the March 16th meeting in a professional manner. On cross-examination Mr. Heinike denied telling Claimant that he would go easy on her if she confessed. Mr. Heinike additionally testified that Dr. Dawson had no explanation for the billing discrepancies in his office and that Dr. Dawson never told him that he was not following the billing schedule for all patients.

Employer presented the expert testimony of Dr. David L. Spence, a board certified psychiatrist who examined Claimant on Employer's behalf. Dr. Spence diagnosed Claimant as suffering from anxiety, depression, poor decision making ability, and agoraphobia; he linked her problems to numerous stress factors in Claimant's personal life. Dr. Spence noted that Claimant was emotionally shocked by the March 16th meeting, but that she overreacted to that event and would have suffered such a reaction regardless of how the situation was handled by Employer. He explained that Claimant reacted subjec-

tively to a normal working condition; however, Dr. Spence admitted that, if Claimant's account of the events of March 16, 1992, was true, that her reaction may not have been totally subjective.

After reviewing the above evidence, the WCJ granted Claimant's claim petition. The WCJ accepted the testimony of Claimant and Ms. Moore as credible and persuasive, accepted the testimony of Dr. Dawson insofar as it corroborated Claimant and Ms. Moore and accepted the opinion of Dr. Santiago. He expressly rejected the testimony of Mr. Burich and Mr. Heinike as not credible, and the WCJ accepted Dr. Spence's testimony only to the extent that it corroborated the testimony of Dr. Santiago. Based on Claimant's credible evidence, the WCJ made the following relevant findings of fact:

28. Claimant was called to a meeting on March 16, 1992, and, without advance notice, wrongly accused of stealing funds. She was suspended without pay pending audit and intimidated with the threat of prosecution and sentencing. Defendant attempted to coerce her into uttering a confession and did not allow her a full opportunity to develop and to explain her denials. Defendant also wrongfully informed Ms. Moore ... that claimant was stealing funds even before an actual audit was conducted which could prove defendant's misplaced suspicions. This was so despite the fact that Dr. Dawson knew that he did not always follow the hospital fee schedule. This amounted to an abnormal event.

. . . .

49. Given the fact that claimant's testimony has been accepted as credible and persuasive, it follows that claimant sustained a normal and objective reaction to an abnormal work event on March 16, 1992. She suffered major depression, single episode, moderate with psychosis, as a result of this abnormal work event.

(WCJ's decision, Findings of Fact Nos. 28 and 49; Reproduced Record at 16a and 19a.) Thus, the WCJ awarded Claimant total disability benefits.

Employer appealed the WCJ's decision to the Board, which reversed the WCJ and denied benefits. The Board concluded that Claimant was not exposed to abnormal working conditions, reasoning as follows:

In the case at bar Claimant was responsible for billing and other bookkeeping functions in her position as an office manager. An audit of her bookkeeping, therefore, could occur, where as here, certain discrepancies arise. Moreover, Claimant testified that she was asked for a confession regarding whether **she did or did not steal money** from Defendant. Her testimony does not support the WCJ's Finding that Defendant attempted to coerce her into uttering a false confession. (FOF# 18). Additionally, as Claimant testified, Defendant warned Claimant that **if** she did embezzle funds that she would be arrested and put in jail, which in fact could be a possible result of embezzling funds. Thus, in light of Claimant's position as an office manager we conclude these events are not so extraordinary to constitute an abnormal working condition.

(Board's opinion at 8; R.R. at 49a.) (Emphasis in the original.) This appeal ensued.

On appeal, Claimant contends that the Board erred as a matter of law in holding that she failed to sustain her burden of proving a compensable mental injury caused by abnormal working conditions and that the WCJ's decision was supported by substantial evidence.

■ In a case such as this one, where Claimant asserts that she sustained a mental injury caused by a mental stimulus, she must prove either "(a) that actual extraordinary events occurred at work which caused the trauma and that these specific events can be pinpointed in time, or (b) that abnormal working conditions over a longer period of time caused the injury."[2] *Blecker v. Work-*

2. The requirement that a claimant prove the existence of abnormal working conditions is intended to distinguish between psychiatric injuries that are compensable because the necessary causal relationship between the employment and the mental disability has been established from those psychiatric injuries that arise from the employee's subjective reactions to normal working conditions. The phraseology 'abnormal working conditions' has devel-

men's Compensation Appeal Board (Pennsylvania Human Relations Commission), 141 Pa.Cmwlth. 317, 595 A.2d 729, 732 (1991), aff'd, 546 Pa. 83, 683 A.2d 262 (1996). It must be established that the mental injury was aggravated by actual employment events, because a subjective reaction to normal working conditions will not support a finding that a claimant sustained a compensable injury. *Id.* Because the relationship between an alleged psychiatric injury and a claimant's employment is not obvious, a claimant must present unequivocal expert medical testimony to establish the causal connection. *Hirschberg v. Workmen's Compensation Appeal Board (Department of Transportation),* 81 Pa.Cmwlth. 579, 474 A.2d 82 (1984). The question of whether a claimant has been exposed to abnormal working conditions is a mixed question of law and fact and is fully reviewable by this Court. *Jeanes Hospital v. Workmen's Compensation Appeal Board (Miller),* 141 Pa.Cmwlth. 308, 595 A.2d 725 (1991), *petition for allowance of appeal denied,* 532 Pa. 648, 614 A.2d 1144 (1992).

In *Calabris v. Workmen's Compensation Appeal Board (American General Companies)* 141 Pa.Cmwlth. 405, 595 A.2d 765 (1991), we affirmed an order of the Board, holding that a claimant whose office was audited was not subjected to abnormal working conditions. In that matter, the claimant, a district manager of a branch office, had dismissed a subordinate for misappropriating funds, and, thereafter, his employer audited the branch. When the auditing team arrived, the claimant was ordered to take a two-week paid leave of absence. Shortly thereafter, the claimant reported to an emergency room, complaining of numbness, sweating, and chest pain and was ultimately diagnosed as suffering from a major depression. Claimant filed a claim petition alleging that he was disabled by a work-related injury. The WCJ and the Board, however, denied him benefits on the ground that he did not prove abnormal working conditions.

We concluded that the audit, although it placed the claimant under great scrutiny and

stress, was not an abnormal working condition. The employer did not increase or alter the claimant's work or work-load, force the claimant to work longer hours, or take any other action that could be deemed abnormal. Furthermore, the employer never accused the claimant of stealing, nor did it suspend him without pay, and the entire episode had begun when the claimant, himself, had dismissed a subordinate for misappropriating funds. In *Calabris,* it was the claimant's subjective fears and worry about the audit that was the root of his problems. Hence, the claimant was not injured by abnormal working conditions, but was injured by a subjective reaction to an audit which, although not the standard audit, was certainly not abnormal.

■ In the present case, unlike *Calabris,* our reading of the record shows that Claimant was not injured by subjective worry over Employer's audit and investigation, but was rather injured by objective and abnormal work-place events, such as being accused of embezzlement in a situation which had been created by Dr. Dawson who was himself at fault by inconsistently billing for patient medical services.

A fair reading of the record shows that Employer's billing problems were caused by Dr. Dawson's frequent decisions to reduce fees for selected patients, and Claimant's attempts to reconcile those reduced fees with Employer's official fee schedule. The following testimony of Claimant is illustrative of how Employer charged patients:

Q. Okay. So, there wasn't any checkbook where you were writing checks or doing anything like that?

A. No. I just had petty cash.

Q. Okay. So, on a daily basis the hospital was being kept apprised of the ——?

A. The activities where we were going wrong, what we needed to improve, every day I talked to her. I made sure I talked to her everyday because Tom was so strict. He was ——.

Q. Which Tom?

A. Tom Zirwas.

*Martin v. Ketchum, Inc.,* 523 Pa. 509, 518–19, 568 A.2d 159, 164 (1990).

oped into a shorthand expression for that critical distinction.

Q. Okay.

A. He was so very strict and he wanted everything exactly by the book and he didn't make any bones about telling you when you were doing something wrong. And he wanted the day sheets to be a little neater so he could see them and a little better and he wanted Doctor Dawson to get a little more control on how he was charging people, because he was just randomly charging anybody anything instead of going through the profile like he was supposed to.

Q. Could you explain that a little bit more?

A. Yeah, Doctor Dawson would charge the Amish $20 because he felt sorry for them and he'd charge the same person on Medicare $60. And I would get into heated arguments with him that we're going to get in trouble for doing that. We've either gotta charge the Medicare patient $20, which is way below your profile or you're going to have to charge the Amish person $50.

Q. Let me back up now. When a patient would come into the office, how was it determined what that charge would be? Did Dr. Dawson actually write that on the chart or how did that come about?

A. I had a super bill made up. I created a super bill and had it made up.

Q. What's a super bill?

A. A super bill comprises three pieces of paper, all carbon with diagnosis codes on it with procedure codes on it, hospital visits, just everything that you get done in a day at a doctor's office. And it was Dr. Dawson's duty to circle, for example, 99021 is a code, I don't know what it is, if it was for an office visit and that would be $60. I knew that 99021 would be say $60. He would circle that and hand me the super bill in the front office and tell [Ms. Moore] to charge $60 because they're on Medicare. . . . So, it was —— it got really crazy there because he just wouldn't charge what he was supposed to charge at all. I mean, he just wouldn't do it. . . . He wouldn't adhere of [sic] the new changes, nothing. He just charged people by what they wore.

(Notes of Testimony (N.T), 9/9/92, at 43–44; Reproduced Record (R.R.) at 72a.) She further elaborated on cross-examination:

Q. Does the doctor indicate on the super bill how he wants that patient charged?

A. Yes.

Q. And does he put an amount on the super bill?

A. Sometimes he'll put in the amount, sometimes he will put a code.

. . . .

Q. Sometimes it would have an actual amount that was to be charged, sometimes it would just have the services?

A. Right. Sometimes it was—more generally it was the code that meant higher monies and he put a lower amount of money on it. [Ms. Moore] would put it on for the lower amount of money and **when I got the code in the back I would bill it for that particular code** . . . .

(N.T., 2/15/93, at 56–57; R.R. at 112a–113a.) (Emphasis added.) She further testified that sometimes Dr. Dawson would not write anything on the superbill, and Claimant had to guess what to charge.

The preceding billing procedure created a situation where Claimant, following the code Dr. Dawson circled on the superbill, would bill insurers at the official price for the services rendered, even though Dr. Dawson had arbitrarily reduced the price for particular patients. However, although Claimant was not always aware that Dr. Dawson had lowered the price for a patient, there is evidence that she sometimes billed insurance companies based on the official price even when she knew of the lower charge. (N.T, 1/15/93, at 59, 81; R.R. at 113a, 119a.) Claimant explained that she did this because Mr. Burich wanted her to charge "by the books" (N.T., 1/15/93, at 31; R.R. at 32), and it is clear from Claimant's testimony that she believed that she was required to follow Employer's official price scale no matter what Dr. Dawson charged, in order to comply with the Medicare price structure and to build an insurance "profile."

In addition, under the billing scheme used by Employer, where a patient's insurance

company was billed more than the patient was actually charged, the patient would receive a check from his or her insurer for the excess money, and not Employer. Hence, it was impossible for Claimant to have embezzled any money under this system. And, while patients occasionally paid Employer in cash, Ernst and Young found no discrepancies in Employer's cash receipts.

Dr. Dawson initiated an investigation of Claimant when he discovered, during the week of March 9, 1992, a discrepancy between what a patient was charged and what the insurance carrier was billed. However, well before this date, Dr. Dawson and Claimant had discussions over Dr. Dawson's practice of disregarding the official fee schedule and reducing fees for certain patients. Further, Ms. Moore also testified that she also told Dr. Dawson that she was concerned over his repeated decisions to lower the fee for certain patients. Dr. Dawson confirmed that he and Claimant had discussions about his billing practices, and he also acknowledged that he was generally aware that Claimant was in communication with SVMC's accounting department with regard to his office's billing practices.

Despite the fact that Dr. Dawson was aware that the medical practice was experiencing billing problems and that his decisions to deviate on a case-by-case basis from the official fee schedule were part of the cause of those problems, he elected to initiate an investigation of Claimant. During the course of that investigation, including the interview on March 16, 1992, where Claimant was questioned by Mr. Burich and Mr. Heinike, he never indicated that he could have some responsibility for the billing irregularities, and he sat mute while Claimant was accused of theft. Dr. Dawson also told Claimant's co-worker, Ms. Moore, prior to the March 16th meeting, that Claimant was stealing money from the practice and that the office locks would be changed.

Further, Dr. Dawson testified that, when he learned of the irregularities in the billing, that he was "scared to death" that he would be accused of Medicare and insurance fraud and that he would be ruined. Dr. Dawson explained that he had to take steps to protect his reputation, because a government investigation would destroy him and that his reputation was more important than Claimant's reputation.

In light of the above, when problems in the office bookkeeping and billing system surfaced in March of 1992, Dr. Dawson either knew or should have known that Claimant was not a thief and that the billing irregularities he discovered were the product of Employer's method of charging patients. Also, Dr. Dawson's testimony indicates that, once his patients learned that their insurance carriers were being overcharged, he feared that he would be charged with insurance fraud and that his professional reputation would be destroyed. Hence, we must conclude that, in order to protect his professional reputation, Dr. Dawson attempted to shift the blame for the billing irregularities to Claimant by initiating an investigation and accusing her of theft.

In addition to Dr. Dawson's role in this matter, Claimant testified that she told Mr. Burich about the problems with the books and that certain employees of SVMC's accounting department, who worked with Mr. Burich, were aware of Employer's billing problems. Claimant was in constant communication with SVMC over billing problems and practices, and the employees in the accounting department knew that Employer's books were "in complete chaos." In fact, Claimant testified that she asked SVMC for instructions about how to correct the books after she discovered that Dr. Dawson charged a patient $20, but Employer billed Medicare $60 for those services, which is precisely the type of billing problem that led to Employer's accusation of theft against Claimant. Therefore, it is clear that, at the time Mr. Burich accused Claimant of theft, he knew or should have known, that the Employer's books and billing practices had long been in disarray and that Claimant was not embezzling money from the practice.

In view of the above, this is not a case where Claimant had a subjective reaction to Employer's inquiry into her management of Employer's books. Instead, we are presented with a scenario where Employer knew that its billing practices and books were in chaos

and where Claimant's immediate supervisor, Dr. Dawson, knew that he was partially responsible for that chaos, but, despite that knowledge, Employer accused Claimant of theft and threatened her with jail. Moreover, we believe that the facts here indicate that Dr. Dawson, to shield himself from charges of insurance fraud, attempted to use Claimant as a scapegoat. Therefore, we hold that Claimant was exposed to abnormal working conditions and is entitled to benefits. Accordingly, the Board's order is reversed.

### ORDER

NOW, January 27, 1999, the order of the Workers' Compensation Appeal Board in the above-captioned matter is hereby reversed.