BOROUGH OF BEAVER, Petitioner,

v.

WORKERS' COMPENSATION
APPEAL BOARD (ROSE),
Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs June 7, 2002.

Decided Nov. 18, 2002.

C. Robert Kennan, III, Pittsburgh, for petitioner.

Michael W. Nalli, Aliquippa, for respondent.

BEFORE: SMITH–RIBNER, Judge, SIMPSON, Judge, and KELLEY, Senior Judge.

OPINION BY Judge SMITH–RIBNER.

The Borough of Beaver (Borough) petitions for review of an order of the Workers' Compensation Appeal Board (Board) that affirmed the decision of a Workers' Compensation Judge (WCJ) granting the claim petition filed by James Rose seeking workers' compensation benefits for a mental injury caused by his employment with the Borough of Beaver Police Department. The Borough's statement of questions includes whether the WCJ erred as a matter of law in finding the work conditions to have been abnormal and whether the WCJ erred in relying upon equivocal or incompetent medical evidence.

## I

Rose worked as a police officer for the Borough beginning in 1979, and he held the rank of lieutenant since 1987. His duties as lieutenant included acting as chief of police when Chief Anthony Hovanec was away, training new officers and dispatchers, verifying certification of new officers, investigating serious crimes and interdepartmental problems, supervising police department employees during his shift, reviewing all police reports submitted and scheduling the work hours for employees. He had his own office with a desk, filing cabinet and a computer that provided access to state criminal records and departmental records. Before December 1996 he had never been subject to discipline.

The testimony recounted by the WCJ established the following facts. On November 26, 1996 several civilians, including Rose's former girlfriend Judith Cashdollar, police officers and Borough officials met at the law offices of the Borough's solicitor. Chief Hovanec supervised the meeting and told the participants that its purpose was to obtain evidence against Rose for alleged problems in the police department. Borough Manager Robert N. Robinson stated that in his twenty-three years in that post he never experienced another meeting where Borough employees and non-employees were so assembled. Sometime prior to this meeting, Rose had initiated an investigation when he discovered that a gun was missing from the department. An investigation was conducted by the Pennsylvania State Police, and it disclosed that Chief Hovanec had taken the gun and exchanged it with another employee but never admitted his involvement. When the investigation was completed the Chief questioned why Rose did not discuss the investigation and avoid causing the Chief unnecessary embarrassment.

When Rose returned from vacation in December 1996, Chief Hovanec instructed him to meet with a special investigator at the solicitor's office. On December 20, 1996, Rose underwent five hours of questioning by the investigator concerning anonymous letters alleging wrongdoing by the Chief. Rose was told that he was the target of an investigation, and he was instructed to attend a meeting with Mayor Robert P. Linn on December 23, 1996. The Chief instructed Rose to turn in his gear and weapon when he reported to work for the next shift. When Rose met with Mayor Linn, Chief Hovanec and the solicitor, he was informed of twelve charges against him. He was suspended without pay until the next Borough Council meeting on January 14, 1997. Council ratified the suspension and issued a formal statement of charges and then fired Rose on February 11, 1997.

Rose appealed his termination to the Borough's Civil Service Commission. After six hearing sessions, the Civil Service Commission held that all of the charges against Rose were false and unfounded and without basis, and it ordered that the charges be dismissed and that Rose be reinstated with full pay for the period of his suspension. When Rose returned to work on June 30, 1997, after the running of the appeal period, Sergeant Joseph Rini was occupying Rose's office and had been instructed by Chief Hovanec not to vacate it. Rose reported to the Chief's office, and he was given a box containing items that had been removed from his locker. His lieutenant bars, bulletproof vest and other equipment and items were missing. Robinson indicated to Rose that the Chief suggested demoting him, but Robinson advised the Chief that he had to obey the law, which required that Rose be reinstated to his former rank.

Rose found that he was stripped of his responsibilities and privileges of being second in command. If Chief Hovanec had his way Rose would have returned as a patrolman. The Chief directed that Rini remain in charge of training and scheduling officers and that Rose would no longer review officers' reports, and he instructed Rini that Rose could no longer take his days off on Fridays and Saturdays. Rose also no longer had access to the computer system that was used to obtain records from various law enforcement agencies. Several officers stated that the Chief discouraged them from acknowledging or having any contact with Rose, who eventually became physically ill, suffering from headaches, shortness of breath and an inability to eat or to sleep. On July 15, 1997, after responding to a call regarding an intoxicated person, Rose became ill and was unable to complete his shift.

Robinson thereafter visited Rose and placed him on administrative leave because he was visibly shaken and was reportedly in bad shape mentally. Rose was assessed by a doctor under the Employees' Assistance Program and then referred to Dr. Michael A. Kwiat, a board-certified psychiatrist, who first met Rose when he was in a partial hospitalization program. Dr. Kwiat diagnosed Rose with major depression with anxiety and stated that Rose was not capable of returning to his work as a police officer. He opined that Rose's psychiatric condition was related to his job and the unfair treatment that he received. Dr. Richard K. Kull, also a board-certified psychiatrist, undertook Rose's treatment after Dr. Kwiat left. He diagnosed Rose with major depression of moderate severity with anxiety symptoms and concluded that the condition was directly related to Rose's circumstances at work and their aftermath. The Borough offered the deposition testimony of Dr. Lawrence F. Bernstein, Jr., another board-certified psychiatrist, whose diagnosis of Rose included major depressive disorder, moderate to severe, and incomplete expression of post-traumatic stress disorder of moderate severity. He concluded that Rose's job was not a substantial cause of his disability.

The WCJ noted that the testimony focused on the gun investigation, extensive Civil Service Commission proceedings and Rose's return to work with the consequences that flowed from the events that occurred. She found most credible the testimony from Rose, Rini and Robinson and from Drs. Kwiat and Kull, but she found the testimony from Chief Hovanec and Cashdollar to be particularly lacking in credibility and self-serving. The WCJ expressly agreed with the Commission's findings that all of the charges against Rose were completely without foundation. She found as fact that the Borough began a pattern of behavior and false accusation against Rose to develop some justifiable basis to discharge him and purposely made it impossible for him to function in his job, which constituted abnormal working conditions that caused Rose's psychiatric illness and resulting disability as of July 16, 1997. On appeal the Board determined that the record contained substantial competent evidence to support the WCJ's conclusion that Rose was subjected to abnormal working conditions, which caused his disability, and it affirmed the WCJ.[1]

---

1. On cross-appeals the Board remanded for consideration of whether certain disability benefits should be offset against past compensation due, but it otherwise affirmed. On remand the WCJ concluded that the disability benefits should not be offset because the insurer was seeking subrogation. The Board affirmed that decision and reaffirmed the holding that the injury was compensable. This Court's review of the Board's decision is limited to determining whether the necessary findings are supported by substantial evidence

## II

In *Ryan v. Workman's Compensation Appeal Board (Community Health Services)*, 550 Pa. 550, 707 A.2d 1130 (1998), the Pennsylvania Supreme Court described the three discrete categories of mental injuries in the workers' compensation context. The categories include: "mental/physical" injury where a psychological stimulus causes a physical injury; "physical/mental" injury where a physical stimulus causes a mental injury; and "mental/mental" injury where a psychological stimulus causes a mental injury. This latter category, mental/mental, is at issue in this case. To satisfy the burden of proof in a mental/mental case, a claimant must prove that she sustained an injury that was caused by her employment and that an abnormal working condition caused the mental injury.[2] *Id.* (citing *Martin v. Ketchum, Inc.*, 523 Pa. 509, 568 A.2d 159 (1990)). *See also Gulick v. Workers' Compensation Appeal Board (Pepsi Cola Operating Co.)*, 711 A.2d 585 (Pa.Cmwlth.1998) (heightened burden of proof exists in mental/mental injury cases under the *Martin* standard).

In *City of Philadelphia v. Civil Service Commission of the City of Philadelphia*, 565 Pa. 265, 772 A.2d 962 (2001), the Supreme Court reiterated that to recover workers' compensation benefits, a claimant must prove by objective evidence that he or she suffered a mental injury and that such injury is other than a subjective reaction to normal working conditions. Further, mental injury cases are highly fact-sensitive, and actual work conditions must be considered in the context of the specific employment to determine if they are abnormal. *Id.* (citing *Wilson v. Workmen's Compensation Appeal Board (Aluminum Co. of America)*, 542 Pa. 614, 669 A.2d 338 (1996)). Moreover, in *US Airways v. Workers' Compensation Appeal Board (Long)*, a mental/mental injury case, 756 A.2d 96 (Pa.Cmwlth.2000), the Court indicated that a claimant may meet her burden by demonstrating *either* that actual extraordinary events occurred at work that can be pinpointed in time causing trauma experienced by the claimant *or* that abnormal working conditions over a longer period of time caused the mental injury. Unequivocal medical testimony is required to establish causation when the causal connection between the mental injury and the employment is not obvious. *Romanies v. Workmen's Compensation Appeal Board (Borough of Leesport)*, 537 Pa. 440, 644 A.2d 1164 (1994).

The Borough first notes that in Pennsylvania the occupation of police officer has been recognized as one that inherently involves unusually high stress. *City of Philadelphia v. Workmen's Compensation Appeal Board (Brasten)*, 682 A.2d 875 (Pa.Cmwlth.1996), *aff'd by an equally divided court*, 556 Pa. 400, 728 A.2d 938 (1999). In *Brasten* the Court did not find abnormal working conditions for a police officer who was engaged in a fatal shootout with a man with an unloaded gun, followed by media attention and public demonstrations, indictment and two trials before the

---

and whether there was an error of law or a constitutional violation. *Russell v. Workmen's Compensation Appeal Board (Volkswagen of America)*, 121 Pa.Cmwlth. 436, 550 A.2d 1364 (1988). The WCJ is the fact finder, and any questions of credibility and weight of the evidence are within the exclusive province of the WCJ. *Id.*

2. *Cf. Farmery v. Workers' Compensation Appeal Board (City of Philadelphia)*, 776 A.2d 349 (Pa.Cmwlth.2001) (a claimant employed in a highly stressful job must show that the event giving rise to the mental injury is so much more stressful that it is abnormal even for that job).

officer was finally acquitted on all charges. In *City of Scranton v. Workmen's Compensation Appeal Board (Hart)*, 136 Pa. Cmwlth. 483, 583 A.2d 852 (1990), where a detective committed suicide, the WCJ found abnormal working conditions when the detective's workload and stress greatly increased while investigating murders by a serial killer, including that of a neighbor, and an unrelated murder involving a schoolmate of the detective's daughter.

In addition, the Borough cites *Thomas v. Workers' Compensation Appeal Board (Derry Township)*, 787 A.2d 1128 (Pa. Cmwlth.2001), for the proposition that verbal abuse and false accusations fail to rise to the level of abnormal working conditions. The Borough asserts that in *McKinney v. Workers' Compensation Appeal Board (Decision Data)*, 564 Pa. 669, 770 A.2d 326 (2001), abnormal working conditions were not found where a supervisor locked an employee in a room with him, called her a derogatory name and threw things about the room and threatened her if she revealed the encounter. Also it notes that the litigation process was held not to constitute abnormal working conditions in *Ryan* where a visiting nurse was involved in a traffic accident and suffered a mental injury triggered by learning that the driver of the other vehicle was suing her. In *Philadelphia Newspapers, Inc. v. Workmen's Compensation Appeal Board (Guaracino)*, 544 Pa. 203, 675 A.2d 1213 (1996), the Supreme Court noted that it is unrealistic to expect that rude behavior, obscene language, incivility and stress will not occur in the workplace and added that inappropriate isolated behavior does not establish an abnormal working condition.

The Court rejects the Borough's arguments that the WCJ erred in finding that abnormal working conditions existed here. Case law fully supports Rose's claim for mental injury, and cases that the Borough relies upon are easily distinguishable from the situation presented. Rose did not violate any department policy, and he did nothing to warrant having his rank and responsibilities taken away when he returned. Rose notes that in cases such as *Brasten, City of Philadelphia* and *Young v. Workers' Compensation Appeal Board (New Sewickley Police Department)*, 737 A.2d 317 (Pa.Cmwlth.1999), benefits were denied for mental injuries claimed on the basis of experiences such as encounters with gun or knife-wielding suspects or involvement in shootouts because these traumatic events were not abnormal for police work. In contrast, Rose was subjected to stressful stimuli including false accusations, public airing of those accusations, suspension, termination, stripping of his duties and authority upon reinstatement and deliberate ostracism instigated by Chief Hovanec, which are not inherent in police work but instead are highly abnormal conditions. Although the Supreme Court in *Philadelphia Newspapers, Inc.* afforded protection to some rude and uncivil behavior, there was only one incident involved in that case as opposed to a months-long pattern of conduct, and Rose's claim is not based upon mere uncivil or obscene language from the Chief.

In *US Airways* two supervisors isolated a female employee in a room and directed obscenities toward her, pushed her and physically touched her in the course of making accusations that proved to be wholly unwarranted. The next day one of the supervisors again screamed at the employee and threatened that security would escort her off the premises if she refused to leave voluntarily. The employer then terminated her on a false basis. This Court readily distinguished *Philadelphia Newspapers, Inc.* based on lack of any justification and the fact that not just one incident was involved and found abnormal

working conditions in such treatment. Similarly, in *Miller v. Workers' Compensation Appeal Board (New Wilmington Family Practice)*, 724 A.2d 971 (Pa. Cmwlth.1999), an office manager for a medical practice was wrongly accused of mishandling billing and of stealing from the practice and was threatened with criminal prosecution and thereafter suspended although the employee's immediate supervisor knew that his improper billing practices were partially at fault in creating chaos in the billings and books. The Court agreed that these circumstances were not normal financial oversight but rather were abnormal working conditions.

The Court agrees that the WCJ's findings, which mirror those of the Civil Service Commission, reveal an abnormal work environment caused by the organized efforts of Chief Hovanec to solicit, make and pursue false accusations against Rose, which led to his termination, exoneration and reinstatement by the Commission. Despite Rose's reinstatement, the Chief refused to comply with the Commission's ruling and continued to undermine Rose's position and to alienate him from the remainder of the police department. The Court rejects the Borough's suggestion that such abhorrent conduct may be regarded as a mere lack of civility to be expected in the workplace. The WCJ aptly stated in her decision that the work environment here is abnormal for any person, including a police officer. The WCJ did not err as a matter of law in finding that Rose's work conditions were abnormal

and that his mental injury was caused by those abnormal work conditions. The Court thus affirms the grant of Rose's claim petition for a mental injury caused by his employment with the Borough Police Department.[3]

### ORDER

AND NOW, this 18th day of November, 2002, the order of the Workers' Compensation Appeal Board is affirmed.

---

**3.** The Borough very briefly argues that because Dr. Kwiat and Dr. Kull acknowledged that the litigation process played a role in Rose's mental injury, their medical testimony was rendered equivocal under *Ryan* and *Gulick v. Workers' Compensation Appeal Board (Pepsi Cola Operating Co.)*, 711 A.2d 585 (Pa. Cmwlth.1998) (holding that the litigation of a termination petition for a back injury was not

an abnormal working condition). The courts have never held, however, that abnormal working conditions may not be found simply because litigation may have been involved in a case. Nonetheless, the Borough offers no valid arguments to support its contention that the doctors' testimony was equivocal or incompetent.